# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

_____

In Re:

Antonio H. Azevedo,                    **Bankruptcy Case**
                                       **No. 11-41561-JDP**
                 **Debtor.**

_____

## MEMORANDUM OF DECISION
_____

**Appearances:**

> David Gadd, WORST, FITZGERALD & STOVER, PLLC., Twin Falls, Idaho, Attorney for Standlee Hay Co;

> Daniel  Green and Brett R. Cahoon, RACINE, OLSON, NYE, BUDGE & BAILEY, CHARTERED, Pocatello, Idaho, Attorney for Gary Rainsdon Trustee.

### *Introduction*

Debtor Antonio Helio Azevedo ("Debtor"), a dairy farmer,

purchased livestock feed products from vendor Standlee Hay Company,

MEMORANDUM OF DECISION – 1

Inc. ("Creditor") during the pendency of Debtor's chapter 12[1] case.  To

determine the status and priority of Creditor's unpaid claim for some of

those purchases in the bankruptcy case, now a liquidating chapter 7 case,

the Court must decide, as a matter of fact, whether the subject transactions

occurred in the ordinary course of business for purposes of § 364(a), and

thus qualify as an administrative expense under § 503(b).  While Creditor

contends in its application to the Court that its claim against Debtor

qualifies for administrative expense status, Dkt. No. 151, the chapter 7

trustee Gary Rainsdon ("Trustee") objected.  Dkt. No. 158.

On November 27, 2012, the parties appeared and presented evidence

on this question of fact.[2]  Thereafter, the parties filed briefs.  Dkt. Nos. 347,

354, and 357.  Having considered the record, evidence and testimony, and

---

[1] Unless otherwise indicated, all chapter and section references are to the
Bankruptcy Code, 11 U.S.C. §§ 101 – 1532, and all rule references are to the
Federal Rules of Bankruptcy Procedure, Rules 1001 – 9037.

[2] In a Memorandum of Decision entered August 27, 2012, the Court held
that a unresolved question of fact existed as to whether the transactions between
Creditor and Debtor were in the ordinary course of business for purposes of
§ 364(a).  Dkt. No. 234.  The Court directed that an evidentiary hearing be
scheduled to resolve this issue.

MEMORANDUM OF DECISION – 2

the arguments of the parties, for the following reasons, Creditor's

application for allowance of administrative expense should be granted.

### *Facts*[3]

Debtor filed a chapter 12 petition on September 20, 2011. Dkt. No. 1.

Debtor continued to operate his business for some time while

unsuccessfully attempting to reorganize his financial affairs. The case was

converted to chapter 7 at Debtor's request on May 11, 2012. Dkt. No. 133.

Creditor asserts it is entitled to an administrative expense claim in

the bankruptcy case in the amount of $463,363.07. The debt arose as the

result of Creditor's sales of feed products to Debtor on credit from January

6, 2012, through May 2, 2012.

At the hearing, Creditor's president, Dusty Standlee testified that

Creditor is a feed broker that locates and buys hay and other feed products

from producers, and then sells those goods to farmers. Mr. Standlee

---

[3] The Court set forth the relevant background and procedural history of
this contest in its prior Memorandum. *See* Dkt. No. 234 at 2-5. The facts recited
here constitute the Court's findings of fact as determined from the testimony and
evidence presented at the hearing. Rules 7052 and 9014.

MEMORANDUM OF DECISION – 3

testified that Debtor had been a long-time customer who usually paid for

purchases according to invoice terms, which required payment from

customers within 30 days of delivery of the products.  However, he

testified, since about 2009, the dairy industry has suffered from severe

economic strains, and consequently, many of Creditor's customers began

paying later than the normal 30 days.  Since then, and even now, Mr.

Standlee explained, it is commonplace for Creditor's customers to pay their

accounts 60 to 90 days after delivery, or even later.

Mr. Standlee's testimony was supported by Creditor's documentary

exhibits entitled "Accounts Receivable Aged Invoice Report" containing

information on all of Creditor's credit accounts for 2011 and most of 2012.

Creditor's Exhs. 101, 102.[4]  These reports show several of Creditor's

significant dairy customers in the Magic Valley of Idaho carried balances

on their accounts with Creditor during the time period near Debtor's

bankruptcy date with balances outstanding at least 30 days, with some up

---

[4] Trustee also admitted a similar document into evidence, Creditor's
"Accounts Receivable Aged Invoice Report ," which contains information about
accounts but spanning a longer period of time.  Trustee's Exh. 205.

MEMORANDUM OF DECISION – 4

to 120 days old.  *See* Creditor's Exh. 101 at 101-27 - 101-30; Exh. 102 at 102-1

- 102-3.

Chancey Standlee, Creditor's salesperson, also testified extensively

at the hearing concerning the accounts receivable records.  His testimony

highlighted several customer accounts receivable with outstanding

balances of more than 30 days.  He testified that, based on his experience,

as winter approaches and sets in, dairy customers typically take longer to

pay their accounts.  Both of the Standlee's also testified that, on behalf of

Creditor, they often "worked with" dairies that had not paid their accounts

current within the 30-day invoice mark in order to help the farmers, to

retain them as a customers, and to insure continued payments to Creditor.

Creditor also offered the testimony of Rick Onaindia, a feed

procurement officer for a large dairy operation known as Bettencourt

Dairies.  Prior to joining Bettencourt, Mr. Onaindia had worked in

commercial lending for 22 years, primarily focused on dairy operations.

He testified that, in his opinion, since 2009, dairies have had to pay for the

livestock feed on "alternative payment schedules."  Mr. Onaindia

MEMORANDUM OF DECISION – 5

explained that this practice frequently involves payment for feed beyond the 30-day invoice period.  He stated that it is now common for dairies to pay for their feed purchases 90 to 120 days from delivery.

Trustee's objection to Creditor's position is two-fold, focusing on both the vertical and horizontal dimensions tests for determining whether transactions constitute the ordinary course of business.[5]

First, in relation to the vertical dimensions test, he argues that Creditor provided excessive amounts of feed to Debtor on credit during the bankruptcy case, and thus their dealings were not in the ordinary course of business.  Trustee points out that prior to Debtor's bankruptcy filing, from April through September, 2011, Debtor's maximum balance due to Creditor for purchases was $93,008.08, and that the largest purchase of feed by Debtor was $35,335.  In contrast, Trustee notes that, after the petition date, Creditor allowed Debtor's account to balloon to a high of $463,363.07, while at the same time continuing deliveries to Debtor.

---

[5] *See* Memorandum of Decision, Dkt. No. 234 at 8 - 10. These tests are discussed in detail below.

MEMORANDUM OF DECISION – 6

Trustee argues that Debtor's post-bankruptcy lag in payment to

Creditor shows that these transactions were not in the ordinary course of

Debtor's business.  To support this, at the hearing, Trustee testified about

his observations concerning Debtor's change in his payment habits after

filing for chapter 12 relief.  Through reference to the documentary exhibits,

Trustee pointed out that, prepetition, Debtor generally paid its invoices, on

average, within about 25 days of receipt of deliveries.  However, after

bankruptcy, Debtor, on average, did not pay Creditor until about 82 days

after receipt.

As to the "horizontal dimensions" test, Trustee points out that the

testimony of Mr. Onaindia did not sufficiently establish that Debtor's feed

payment practices as to Creditor fell within those common in the dairy

industry.  In particular, Trustee suggests the witness's opinions are

unreliable because Mr. Onaindia is familiar solely with larger dairy

operations, not a smaller ones like that of Debtor.

### *Analysis and Disposition*

A. Section 503(b)(1)(A)'s "Actual and Necessary" Tests

MEMORANDUM OF DECISION – 7

Under the Bankruptcy Code, the administrative expenses of a bankruptcy case are those claims incurred for "the actual, necessary costs and expenses of preserving the estate." § 503(b)(1)(A).  Administrative expenses allowed under § 503(b) enjoy a high priority of payment in bankruptcy cases.  § 507(a)(2) (providing priority for administrative expenses subordinate only to domestic support obligations and trustee expenses).  The Supreme Court instructs that the costs for "preservation of the estate" include those incurred for the continuation of the business of the estate.  *Reading Co. v. Brown*, 391 U.S. 471, 475 (1968).  By assuring claimants priority of payment, § 503(b)(1)(A) therefore serves an important purpose, in that it provides an incentive to vendors and suppliers of necessary goods and services to continue to deal with a debtor in bankruptcy to continue its business and thus benefit the estate and all its creditors.  4 COLLIER ON BANKRUPTCY, ¶ 503.06[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

Bankruptcy courts apply a two-part test to determine whether a claim represents  an "actual and necessary expense" and thus should be

MEMORANDUM OF DECISION – 8

allowed as an administrative expense for purposes of § 503(b)(1)(A). *Id.* at

[3]. To make this decision, the court must determine: (1) whether the

expense arose from a transaction with the estate; and (2) whether the

transaction directly and substantially benefitted the estate. *Abercrombie v.*

*Hayden Corp. (In re Abercrombie)*, 139 F.3d 755, 757 (9th Cir. 1998); *Microsoft*

*Corp. v. DAK Industries, Inc. (In re Dak Industries, Inc.)*, 66 F.3d 1091, 1094

(9th Cir. 1995); *Hopkins v. Idaho State University Credit Union, et al. (In re*

*Herter)*, 464 B.R. 22, 32 (Bankr. D. Idaho 2011). The creditor bears the

burden of proving its claim is entitled to allowance as an administrative

expense. *In re DAK Industries, Inc.*, 66 F.3d at 1094. While the bankruptcy

court has broad discretion in making this determination, it should

narrowly construe this test for allowance of an administrative expense. *Id.*

  B. Section 364(a) and the Ordinary Course of Business

    Section 364(a) provides that "[i]f the [debtor] is authorized to operate

the business of the debtor under section . . . 1203 . . . the [debtor] may

obtain unsecured credit and incur unsecured debt in the ordinary course of

business allowable under section 503(b)(1) of this title as an administrative

MEMORANDUM OF DECISION – 9

expense." In other words, if a party supplies goods on credit to a debtor

operating a business in a bankruptcy case, and if the transaction was "in

the ordinary course of business," the debt arising from that transaction

may be allowed as an administrative expense. If the debt incurred or

credit obtained by the debtor did not occur in the ordinary course of

business, it is not automatically recognized as an administrative expense.[6]

Two tests have been employed by the Ninth Circuit in determining

whether a transaction is in the ordinary course. *See Aalfs v. Wirum (In re*

*Straightline Investments, Inc.),* 525 F.3d 870, 879 (9th Cir. 2008); *Burlington*

*Northern R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.),* 853 F.2d

700, 704 (9th Cir. 1988); *Crawforth v. Wheeler (In re Wheeler),* 444 B.R. 598, 612

---

[6] Of course, a supplier and a debtor need not speculate about whether a contemplated transaction will qualify as an allowed administrative expense. In advance of doing the deal, they may ask the Court, after notice to the parties in the bankruptcy case and a hearing, to bless the transaction under § 364(b) (providing that the court may authorize a debtor to incur unsecured debt "other than under subsection (a)" allowable under § 503(b)(1) as an administrative expense). This contest serves as strong evidence for the wisdom and business prudence of such approach. Whether out of ignorance, neglect, or unknown business considerations, Creditor did not take advantage of the Code's fail-safe procedure to protect its rights.

MEMORANDUM OF DECISION – 10

(Bankr. D. Idaho 2011).  Generally, both tests must be satisfied for a

transaction to qualify as ordinary course.  *In re Straightline Investments, Inc.*,

525 F.3d at 879.

> *i. The Vertical Dimensions Test*

The first test is the "vertical dimensions, or creditor's expectation,

test." *Id.*  This test weighs the subject transaction from the point of view of

a hypothetical creditor, asking whether the deal with the debtor "subjects a

creditor to economic risks of a nature different from those he accepted

when he decided to extend credit." *In re Dant & Russell, Inc.*, 853 F.2d at

705.  In applying this test, courts compare the debtor's prepetition business

practices to its post-bankruptcy practices.  *In re Straightline Investments, Inc.*,

525 F.3d at 879.  But "changes between prepetition and postpetition

business activity alone are not per se evidence of extraordinariness." *The

Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In

re Johns-Manville Corp.)*, 60 B.R. 612, 617 (Bankr. S.D.N.Y. 1986).  In

applying this test one court observed that "some transactions either by

their size, nature or both are not within the day-to-day operations of a

MEMORANDUM OF DECISION – 11

business and therefore extraordinary." *Johnston v. First Street Companies (In re Waterfront Companies, Inc.)*, 56 B.R. 31, 35 (Bankr. D. Minn. 1985).  The primary focus under the vertical dimensions test is the types of transactions a debtor is reasonably likely to enter into in the course of its business. *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 394 (S.D.N.Y. 1983).

*ii. The Horizontal Dimensions Test*

The other test used to determine the "ordinariness" of a transaction is the "horizontal dimensions test." *Straightline Investments, Inc.*, 525 F.3d at 880-81.  This test looks at similarly-situated businesses and determines whether the transaction is one in which  those other businesses would be involved. *Id* at 881.  The test gauges whether either the creditor or debtor did something to "gain an advantage over the other creditors." *Id.* (quoting *In re Dant & Russell, Inc.*, 853 F.2d at 704).

In *Credit Alliance Corp. v. Idaho Asphalt Supply, Inc. (In re Blumer)*, 95 B.R. 143 (9th Cir. BAP 1988), the Bankruptcy Appellate Panel of the Ninth Circuit addressed both of the ordinary course of business tests employed

MEMORANDUM OF DECISION – 12

under § 364(a) in a case with facts similar to those here.  In *Blumer*, the

supplier-creditor, sold the chapter 11 debtor, a road construction

contractor, asphalt on credit for its use in completing a job obtained

postpetition.  *Id.* at 144.  The debtor paid some of the creditor's invoices,

but a significant amount remained due when the debtor's case was

converted to chapter 7.  *Id.*  The creditor then applied to the bankruptcy

court for allowance of an administrative expense for the balance due

pursuant to § 503(b).  *Id.*  The bankruptcy court held that under both the

horizontal or vertical dimensions tests, the debtor acted in the ordinary

course of business in the asphalt transactions.  In affirming the bankruptcy

court's decision, the BAP noted that, in purchasing the asphalt on credit,

"debtor did not subject his creditors to unexpected economic risks.

Similarly, it is a reasonable assumption that other road builders would

obtain asphalt on credit in the ordinary course of their businesses."  *Id.* at

148.

     C. Disposition

     The Court concludes that Creditor has adequately demonstrated

MEMORANDUM OF DECISION – 13

through its proof that the balance due from Debtor for the feed purchases

constitute "actual and necessary" expense of preserving the estate for

purposes of § 503(b)(1)(A).

As explained above, in order to meet this test Creditor was required

to show that its transactions with Debtor were:  (1) with the bankruptcy

estate; and (2) directly and substantially benefitted the estate.  Here, Debtor

commenced the bankruptcy case in September 2011, and the disputed

transactions occurred between January and May 2012.  It is therefore clear

that all of the transactions were between Creditor and Debtor acting on

behalf of the bankruptcy estate, satisfying the first prong of the test.

The Court also concludes that, in supplying the estate feed needed for

Debtor's livestock directly and substantially benefitted the estate, meeting

the second prong of the above mentioned test.  Clearly, feed is a required

supply for the operation of a dairy.  Simply put, a dairy-debtor's income is

derived from milk sale proceeds; milk is product of the dairy's livestock;

and without feed, the animals can not produce the milk.  It is therefore

hardly a stretch for the Court to find that the feed Debtor purchased from

MEMORANDUM OF DECISION – 14

Creditor for his livestock directly and substantially benefitted the

bankruptcy estate.

But were the transactions between Debtor and Creditor in the

ordinary course of business under § 364(a)?  The Court concludes that

when measured by both the vertical and horizontal dimensions tests, they

were.

As explained above in applying the vertical dimensions test, the

Court must review the challenged transactions from the perspective of a

"hypothetical creditor" to determine whether they would subject that

creditor to economic risks different than those it accepted when it decided

to extend credit.  *In re Straightline Investments, Inc.*, 525 F.3d at 879.  In

doing so, the Court looks to Debtor's prepetition practices, and compares

them with his postpetition practices.  *Id.* at 879-80.

Debtor routinely entered into credit transactions for the purchase of

feed for its livestock both pre- and postpetition for similar amounts.

Trustee does not dispute this:

[Creditor] states that the Trustee's objection is based upon

MEMORANDUM OF DECISION – 15

the fact that the 'Debtor purchased more hay and haylage from [Creditor] post-petition than it did pre-petition.' However, this is not the basis for the Trustee's objection. The Trustee's concern is with the amount of feed that [Creditor] sold to the Debtor *on credit*, and the fact that [Creditor] continued to deliver increased amounts of feed notwithstanding the fact that the Debtor became extremely *delinquent* with respect to its accounts payable to Creditor.

Trustee's Closing Argument, Dkt. No. 354 at 7 (emphasis in original).  In other words, Trustee does not take issue with the "size" of Debtor's transactions with Creditor, but targets the "nature" of the transactions.

The Court concludes that whether Debtor purchased the feed for cash paid on delivery, or took advantage of the credit terms offered by Creditor, it would make no difference to a hypothetical creditor in this instance.  Put another way, whether a creditor were paid immediately, or later in Debtor's business cycle would not subject that hypothetical creditor to any extraordinary risk.  Debtor must earmark a portion of his milk income to pay to feed his animals in order to continue to operate his business.  The nominal amount of interest charges and late fees claimed by

MEMORANDUM OF DECISION – 16

Creditor here support this conclusion.[7]  Further, the nature of the

transactions with Creditor extending credit to Debtor, a long-time

customer, for a longer period of time postpetition, considering the state of

the market after 2009 as testified to by Dusty Standlee, Chancey Standlee,

and Rick Onaindia, is not extraordinary.  Therefore, the Court concludes

that Creditor has shown that these transactions were in the ordinary course

of business pursuant to the vertical dimensions test.

     With respect to the horizontal dimensions test, the Court considers

and compares the practices of similarly-situated businesses to determine

whether the subject transactions are typical in a particular industry.  Both

parties submitted documentation about Creditor's accounts receivable

during the relevant times, and in particular, the age of those accounts.  In

examining these reports, it becomes clear that Debtor's transaction

amounts and terms are consistent with those involving Creditor's other

dairy customers.  With respect to the time elapsing between delivery of

---

[7] Creditor is seeking $8,104.13 in interest and late charges as a part of their $463,363.07 claim.

MEMORANDUM OF DECISION – 17

product and customer payment, it is obvious that Creditor has had several

accounts that have significantly exceeded the optimal 30-day payment

window specified in its invoices. Further, the Court finds the testimony of

Mr. Onaindia credible and persuasive as to the feed and credit practices of

other dairy operations, and concerning the longer periods of time generally

needed by these operators to pay feed invoices after the downturn in the

dairy market, starting in 2009. Therefore, the Court concludes that

Creditor has shown that its credit transactions with Debtor postpetition

satisfy the horizontal dimensions test.

As it was in *In re Blumer*, it could be reasonably expected that Debtor

would enter into the transactions with Creditor to acquire feed on a credit

basis. The terms granted to Debtor by Creditor were not extraordinary in

the light of the evidence provided to this Court. Because Creditor has

shown that its postpetition transactions with Debtor occurred in the

ordinary course of business, Creditor's claim for unpaid livestock feed

purchases in the amount of $463,363.07 should be allowed as an

administrative expense in this case.

MEMORANDUM OF DECISION – 18

*Conclusion*

Creditor's application for allowance of an administrative expense

will be granted in a separate order.

Dated:  January 22, 2013

_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

MEMORANDUM OF DECISION – 19